Docket No. 08-cv-4305 (JGK)
Case No. 07-B-13481 (MG) (Bankruptcy Court)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of

MAYNE MILLER,

                                    Debtor                    Chapter 13

---

MAYNE MILLER,

                                    Appellant

            -against-

JEFFREY L. SAPIR, Chapter 13 Trustee,
IRENE CARGONJA, and
79 EAST OWNER, LLC,

                                    Appellees

---

REPLY TO AFFIRMATION OF TRUSTEE
AND DECLARATION OF LANDLORD'S ATTORNEY

---

MAYNE MILLER

85 Worth Street, 5th Floor
Mail: P.O. Box 8050, G.P.O.
New York, NY 10116
(212) 966-1696
Attorney-Appellant

---

To: Jeffrey L. Sapir, Ch. 13 Trustee, 399 Knollwood Road, White Plains,
NY 10603, (914) 238-7272, Appellee

Mitofsky, Shapiro, Neville & Hazen, 152 Madison Avenue, New York,
NY 10016, (212) 736-0500, Attorney for Appellee 79 East Owner LLC

Harvey J. Cavayero, 57 Old Country Road, Westbury, NY 11590, (516)
478-5818, Attorney for Appellee Irene Cargonja

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| In the Matter of | | Case No. 07-B-13481(MG) |
| MAYNE MILLER, | | Chapter 13 |
| | Debtor | |

---

| | | |
|---|---|---|
| MAYNE MILLER, | | |
| | Appellant | |
| -against- | | Docket No. 08-cv-4305 (JGK) |
| JEFFREY L. SAPIR, Chapter 13 Trustee, IRENE CARGONJA, and 79 EAST OWNER, LLC, | | REPLY DECLARATION |
| | Appellees | |

---

## REPLY TO AFFIRMATION OF TRUSTEE
## AND DECLARATION OF LANDLORD'S ATTORNEY

MAYNE MILLER, an attorney duly admitted to the bar of the United States District Court for the Southern District of New York, hereby declares pursuant to 28 U.S.C. § 1746 subject to the penalties of perjury that the following statements are true.

1. I am the Debtor in the bankruptcy case underlying the within appeal and am the Appellant in the within appeal.

2. I submit this Declaration in reply to the Affirmation of Jeffrey L. Sapir, Standing Chapter 13 Trustee, dated July 15, 2008, which opposed consolidation of the within appeal with the pending appeal under Docket No. 08-cv-4305, and in reply to the Declaration of William J. Neville, attorney for 79 East Owner, LLC ("79"), the landlord of the Debtor's rent-stabilized apartment and a named creditor in his Chapter 13 bankruptcy case.

### The Sapir Affirmation

3. The Affirmation of the Trustee should be rejected in its entirety because the Trustee has not even identified the order being appealed from. In ¶ 3 of his Affirmation, he describes the Order as granting relief from the automatic stay to Creditor 79.

4. The date of the Order granting partial relief from the automatic stay to 79 was

afm/m p. 3 08-cv-4305

indeed dated January 4, 2008; but the Trustee has misinformed this Court because the order actually being appealed from is the other order entered on January 4, 2008 (ECF Doc. # 23) in which the Hon. James M. Peck, Judge of the United States Bankruptcy Court, denied the Debtor's motion for reconsideration of Judge Peck's statement on the record at the hearing of December 13, 2007, that he had decided to ignore the debtor's two requests for an extension of time in which to file his Schedules, Statement of Financial Affairs, proposed Chapter 13 Plan, and other informatory documents required by § 521(a) of the United States Bankruptcy Code (Title 11 U.S.C., or "Code").

5. The Order to which the Trustee refers was never appealed, and pursuant to its terms the parties did appear in the Civil Court of the City of New York on January 8, 2008, and reached a settlement of the monetary amount for which the Debtor was liable as of that date. The judgment for the stipulated amount ($23,000) was entered with a provision, in accordance with said Order of the Bankruptcy Court, that required a further Order of the Bankruptcy Court before any warrant of eviction could be issued or executed.

6. The Trustee admits he has no position on reconsidering the dismissal of the appeal under Docket No. 08-cv-4305. His opposition to consolidation of the two pending appeals in this Court is contained exclusively in ¶ 7 of his Affirmation. This paragraph misidentifies the order appealed from under Docket No. 08-cv-4305, misidentifies the standard of review to be applied by this Court, and attempts to raise a false issue regarding the Bankruptcy Judges issuing the Orders appealed from.

7. The Trustee fails to inform this Court that all Chapter 13 bankruptcy cases in the Southern District are administratively assigned to a different judge at the beginning of each calendar year. The Order of January 4, 2008, that is the actual subject of the within appeal was still issued by Judge Peck, who had been the judge administratively assigned to all Chapter 13 cases in 2007, because it determined a motion for reconsideration and therefore should be decided by the judge whose order was sought to be reconsidered. This was proper procedure even though by that

afm/m p. 4 08-cv-4305

time the bankruptcy case had already been administratively transferred to the Hon. Martin Glenn, Judge of the United States Bankruptcy Court.[1] Since the entire case was transferred *in toto* with all other Chapter 13 cases, there is no significance to be assigned to the fact that one of the orders being appealed was issued by one judge and the other order (of dismissal) was issued by another.

8. The Trustee mistakenly asserts that the two orders being appealed were based on different sections of the Code because he misidentified the first Order. The Order of January 4, 2008, did not identify any sections of the Code; and there was no prior formal order that would have done so, since Judge Peck only made a statement on the record and never entered an order either embodying his statement on the record or else formally denying or declining the Order to Show Cause and *ex parte* application the Debtor had submitted in November, 2007. However, the subject of those applications was the documents required by §§ 521(a) and 1321 of the Code and the time limitations of Fed.R.Bankr.P. 1007 and 3015. The Order being appealed did not specify any sections of the Code or Rules, but the Order from which reconsideration was sought did cite § 1307 of the Code, which in turn references § 521 and 1321. Therefore, the two appeals sought herein to be consolidated do concern the same statutory provisions and should therefore be consolidated.

9. The Trustee also misidentifies the standard of review to be applied by the District Court when he refers to the bankruptcy judges being "clearly erroneous". There is little in the record that could be considered a question of fact to which the "clearly erroneous" standard would apply. The Debtor believes that the real issues are questions of law to which a "de novo" standard of review applies. "Because the lower court made no findings of fact, this court's standard of review is *de novo*." *Gunn v. TitleMax of Ala., Inc. (In re Gunn)*, 387 B.R. 856 (M.D. Ala. 2008).

10. The issues in the Debtor's later bankruptcy filing (Case No. 08-11418) are quite different than the issues in the within appeal, since the later filing, after a warrant of eviction had

---

[1] The fact that the administrative transfer had already taken place apparently led to the mistaken entry on the Docket sheet in this Court indicating that the January 4, 2008 Order was signed by Judge Glenn. It was in fact signed by Judge Peck.

afm/m p. 5 08-cv-4305

been issued, implicates § 362(l) of the Code, which has no applicability in the within appeals.

### The Neville Declaration

11. The Declaration of 79's attorney (the "Neville Decl.") also makes numerous misstatements of fact, but they are far more serious and indicate a calculated attempt to distort the record and mislead the Court.

12. There is no merit to the conclusory allegations in the beginning of ¶ 2 of the Neville Decl., and there is clearly no merit in the allegations that the motion pursuant to Fed.R.Civ.P. 59 is untimely. The Rule provides (Rule 59[b]) that such motion must be filed no later than ten days after underentry of the judgment. The Neville Decl. admits that the judgment was entered on May 19, 2008. The within motion was made on June 3. Computation of time is accomplished under the provisions of Fed.R.Civ.P. 6(a), which provides that when a period of time allowed is less than 11 days, "intermediate Saturdays, Sundays and legal holidays shall be excluded". The date of the event is excluded from the computation.

13. Calculating according to the applicable rule, the first day was May 20. Following out the week, the fourth day was May 23. May 24 was a Saturday, May 25 a Sunday, May 26 Memorial Day. Therefore the fifth day was May 27. following out the week, the eighth day was May 30. May 31 was a Saturday, June 1 was a Sunday. Therefore the ninth day was June 2 and the tenth day was June 3—the day the motion was filed.

14. The Neville Decl. correctly observes that the Debtor did not appeal the grant of limited relief from the automatic stay contained in the other Order issued by Judge Peck on January 4, 2008. It also notes that the designation of items to be included in the record on appeal and the statement of issues on appeal were not filed within ten days of the filing of the Notice of Appeal. The ten-day period for filing the designation and statement, however, is not jurisdictional; and relief can be granted on the grounds of excusable neglect. When the delay in filing the designation and statement are not the result of bad faith and do not prejudice the appellee, the appeal should be heard on the merits. *Mondelli v. Greenberg*, 2007 U.S. Dist. LEXIS 92552 (D.

afm/m p. 6 08-cv-4305

N.J. Dec. 12, 2007).

15. Here, the appellees are not prejudiced because the appeal of the final order dismissing the Debtor's bankruptcy case has been timely appealed and is being perfected. Only the Debtor could be prejudiced if the order denying reconsideration of the decision of Judge Peck simply to ignore the Debtor's valid requests for an extension of time to file the many documents required in a Chapter 13 bankruptcy case were not also brought up for review, since if the request for an extension had been granted, the Debtor could have complied with a reasonable deadline requirement in view of the fact that he was released from the obligation to prepare an Appellant's Reply Brief in the companion appeals still pending in the Second Circuit by the Circuit's Order of Clarification that the Debtor received on January 11, 2008.

16. The reference to the Debtor's current bankruptcy filing in ¶ 4 of the Neville Decl. contains numerous erroneous statements designed to mislead the Court. The current filing places the Debtor in an entirely different position vis-à-vis his landlord. The current filing was, because of the misplacement of a crucial paper in the Civil Court file, not made until after the warrant of eviction, pursuant to the January 8, 2008 stipulation in the Civil Court, was finally issued on April 3, 2008. Since a judgment of possession had already been issued, § 362(b)(22) of the Code became applicable. This subsection provides that there is <u>no stay</u> in effect under § 362(a)(3) of the Code, meaning that any act against property in enforcement of the extant judgment of possession could take place, and the Debtor could be evicted from his sole primary residence. Thus, the assertion in the Neville Decl. that the Debtor currently has a stay in effect is facially incorrect based on § 362(b)(22).

17. Whether a stay is currently in effect or was in effect on the date of filing (April 18, 2008) and the extent of any such stay are novel questions of bankruptcy law, dependent upon the interpretation of several new additions to the Code enacted by the "Bankruptcy Abuse Prevention and Consumer Protection Act" ("BAPCPA") of 2005. Interestingly enough, it appears that there have been no reported decisions in this circuit interpreting the significance of these new

sections, at least in the situation of this Debtor, who has complied with all the requirements of § 362(l), to which § 362(b)(22) is expressly made subject.

18. Judge Glenn, to whom all Chapter 13 cases are presently assigned, when presented with 79's Objection to the Debtor's <u>second</u> certification under § 362(l)(2) (that the entire monetary amount of the judgment had been paid) entered an order "reinstating" the automatic stay for ten days, requiring the Debtor to move to vacate the warrant in the Civil Court. (A motion for reconsideration is now pending, since the Debtor believes that the new Code provisions supersede State law if § 362[l] is fully complied with.) Nevertheless, under Judge Glenn's interpretation, the Debtor did <u>not</u> have a stay in effect during the period April 18 to June 26. Also, under that interpretation, if the Civil Court were to deny Debtor's motion to vacate the warrant, there again would be <u>no stay</u> in effect, and the instant appeal could not be considered to be moot on that ground.

19. The inference that the Debtor has suffered no prejudice from the dismissal of his prior bankruptcy case because another bankruptcy case has been filed is ridiculous. Under the former case, the entire amount of the pre-petition money judgment could be treated under the Debtor's Chapter 13 Plan, which could extend the payout period for up to five years ($383 per month). Under the current case, (08-11418) the entire amount of the judgment had to be paid within 30 days of filing the petition, which was accomplished only by dint of assiduous efforts at obtaining financing before the case was filed. Thus, the Debtor's situation is that he has depleted his available financial resources and faces a significant amount of short-term pre-petition debt and still must make periodic payments to the landlord while the landlord is refusing to supply essential services and is returning the payments as a ploy to obtain possession of the subject apartment so it can be warehoused along with other apartments in the building, accelerating the process of demolishing the building to make way for high-rise "luxury" construction at some indeterminate time in the future. This is a more than adequate explanation of why the Debtor would be severely prejudiced if forced to reorganize under his current filing rather than under the filing that has been

afm/m p. 8 08-cv-4305

dismissed. If more were needed, there presently exists the possibility that the Civil Court could deny the Debtor's motion to vacate the warrant, and the Debtor would be still more severely prejudiced by having to pursue all appeals while homeless.

20. The allegation in ¶ 5 of the Neville Decl. that the Debtor suffered no prejudice from the denial of his applications for extensions of time because the dismissal was based solely on the absence of a "confirmation" plan is irrational, because the filing of a proposed plan is one of the acts for which an extension of time was sought. Payment under a proposed plan cannot be effectuated until a plan has been proposed (*see*, § 1326[a][1]), and the Trustee was accepting no payments in any event.

21. When the Debtor suggested a date of December 10, 2007, for the requested extension of time to file the required documents, that calculation was based on what appeared to be his work obligations and current income at the time. It was also based on the assumption that an order would soon be entered setting a deadline, with which the Debtor would then have to comply. The fact that no order was entered by December 10 indicated that a decision on an appropriate date had not been made. Thus it was a complete surprise to hear Judge Peck's statement at the hearing of December 13, 2007, that a decision had already been made simply to ignore the Debtor's applications.

22. The Debtor then was confronted with the quadruple problems of 1) continuing to work on the Appellant's Reply Brief for the Second Circuit, 2) attempting to collate all the data necessary to quantify with some degree of reasonableness the amounts due from approximately 20 clients and past clients for past services, 3) preparing for the trial of the landlord's claim for rent and legal fees and the Debtor's defenses for breach of the statutory warranty of habitability and the lack of jurisdiction to pursue a summary proceeding based on rents accruing to the former owner that were not contemporaneously assigned with the transfer of title to the new owner, 79, and 4) somehow finding new paying clients in order to garner some income to meet current expenses and his payment obligations under the Code.

afm/m p. 9 08-cv-4305

23. After the first of the above problems was removed by the clarification Order of the Second Circuit on January 11, the Debtor was able to proceed with the prodigious problem of locating and collating records from dispersed files and unopened packing cartons that were needed to make reasonable estimates of the amounts due under the "accounts receivable" section of Schedule B. Many of those files had not been readily accessible since the Debtor was forced to move out of his earlier office in March 2006. Most were not readily accessible, and only the fact that in recent years the Debtor has maintained on his computer both documents filed for clients and documents served on him by opposing parties, so that some estimate of the time spent in document preparation (essential components of bills that have been unpaid for years) could be made to reach an honest figure for accounts receivable in Schedule B.

24. Thus, by the time the hearing was held on the Trustee's motion, the Debtor's Schedules and Statement of Financial Affairs had been prepared.[2] Only the Chapter 13 Plan remained to be formulated, and that would also have been completely formulated by the time of the hearing except for the unexpected requirement of a Judge of the Housing Part of the Civil Court to require another appearance in his Court the day after argument of an Order to Show Cause for a client there to accomplish a final payment of rent to allow that client to remain in his apartment. More importantly, since the Order dismissing the entire bankruptcy case was not entered until February 1 and the Debtor's Plan had already been filed by that time, the only ground for the dismissal was already obsolete, and reconsideration was appropriate.

25. It is the Order denying such reconsideration that is the subject of the second appeal before this Court. Inasmuch as there would have been no ground for dismissal if the Debtor's earlier applications for extensions of time to file required documents had been granted, there is an intimate and essential connection between the two appeals; and Appellant's posture in the second appeal cannot be definitively determined until it is known what the status of the first

---

[2] They were prepared by January 21 but because of a delay in converting computer files, the filing date was January 22, a few minutes after midnight.

afm/m p. 10 08-cv-4305

appeal will be.

26. It is not correct to allege in ¶ 6 of the Neville Decl. that the Debtor gave himself a deadline for filing his Schedules. In the absence of any order, the Debtor was justified in believing that a first request for an extension would eventually be granted, especially since the voluminous data required to be assembled by any Chapter 13 debtor who is "in business" within the meaning of the Code were in a state of disarray that was plausibly explained. It is easy to make the conclusory allegation that Judge Peck did not abuse his discretion by refusing to extend the Debtor's time to file his Schedules, but that misses the point of the appeal. If a judge were to take the extraordinary step of denying an extension of time on a first application by a Chapter 13 debtor showing more than adequate ground therefor, that certainly would be subject to review as an abuse of discretion. However, what Judge Peck did was to decide not to take any action at all on an application duly presented to him and on which he had an obligation, as a federal judge, to act. Compounding the injury to the Debtor, he kept this decision secret until it was revealed in a comment at a hearing on another matter and not included in any order at all. It is the Debtor's contention that this course of action is not properly reviewable as an abuse of discretion and should be addressed as a failure to act or a violation of duty—not to decide a certain way but simply to decide.

27. The allegation in said ¶ 6 that Judge Peck stated in his Order that my application for an extension of time "should have been made by motion on notice and not by submitting an ex parte order to show cause" is completely irrational. There never was an order denying my requests for an extension of time to file required documents. The only Order that was entered was the denial of my motion for reconsideration of Judge Peck's comment on the record on December 13, 2007. That Order (Case No. 07-13481, ECF Doc. # 23) contains no indication anywhere that such an application had to be made by motion on notice. The actual sequence of events was that the Debtor presented an Order to Show Cause, after which he received a telephone call from chambers advising that an Order to Show Cause was not required and that the application could be made by

afm/m p. 11 08-cv-4305

submitting an ordinary *ex parte* order, which was generally granted on the first such application.

The Debtor complied with that instruction and received no response, nor was any docketed.

28. There is no basis for the conclusory allegations in ¶ 7 of the Neville Decl. that

the two appeals should not be consolidated because they deal with different parties, seek different

relief, and are based on different questions of law and fact. Mr. Neville has repeatedly asserted that

his client is the only real party in interest. Since he abandoned his motion for further relief from

the automatic stay under the Debtor's first Chapter 13 case after the order of dismissal was entered,

it was that order that was submitted to the Civil Court in order to obtain the warrant of eviction; so

that he cannot deny that his client was a party in interest therein. To the extent that an application

for an extension of time to file Schedules has any parties in interest at all, all creditors have a

similar stake in the outcome. The ultimate relief requested in the two motions whose appeals are

sought to be consolidated was different because the motions were made at different stages in the

proceedings. But the relief requested in the first application (extension of time to file documents)

is obviously directly related to the relief requested in the second motion (dismissal for failure to

file documents on time), since if the first application had been granted, there could not have been

any ground for the second motion (to dismiss). There are numerous overlapping questions of fact

and law, including the multiple justifications for the Debtor having to file documents outside of the

non-jurisdictional time parameters provided in the Code and the Bankruptcy Rules. There is a

virtual complete overlapping of the principles of law involved, since whether the delay in filing the

required documents constitutes prejudice to any creditor or excusable neglect on the part of the

Debtor is the underlying question of law in both. The question of whether an outstanding order of

the Second Circuit, with which the Debtor, as an attorney, was ethically obligated to comply, takes

precedence over the non-jurisdictional time parameters of the Bankruptcy Code as applied to his

own case is also a question of law that requires determination in each of the pending appeals.

29. The conclusory allegation at the head of ¶ 8 of the Neville Decl. is untrue and

unsupportable, nor does the citation of several inapposite cases which reach the same generic

afm/m p. 12 08-cv-4305

conclusion shed any light on this case. Regarding the January 4, 2008 order appealed from, one controlling principle of law is that a judge has an obligation to decide an application properly put before him. The most obvious fact that the Court overlooked was that all of the complicated matters that were taking up the Debtor's time carried no possibility of any earned income, and in order to meet his payment obligations under Chapter 13, as well as to fulfill his ethical obligation as a debtor-in-possession to carry on his business in the most profitable manner for the benefit of all of his creditors, the Debtor was obligated to seek (and find) some way of maintaining sufficient earned income to meet his overhead and remain in active operation of his business.

30. *In re Perry H. Koplik & Sons, Inc.*, 2007 WL 3076921, *4 (Bankr. S.D.N.Y. October 18, 2007) raised the question of a controlling principle of law only in the context of an attempt to demonstrate exceptional circumstances justifying permission to appeal from a non-final order. The case had nothing to do with consolidation of two different appeals nor with reconsideration based on overlooking a controlling principle of law.

31. *In re Asia Global Crossing Ltd*, 332 B.R. 520, 524 (Bankr. S.D.N.Y. 2005) does address the standards for a motion for reconsideration, including whether such a motion is necessary to correct a manifest injustice. However, the point argued, whether under the circumstances of the case, there was an anticipatory repudiation of a contract, was adjudged by the Court to have been fully litigated in the prior order. In the case at bar, however, the issues over the Debtor's application for an extension of time were not argued on the prior Order at all; indeed there was no prior order, only a parenthetical comment on the record in another matter.

32. The decision in *In re Adelphia Business Solutions, Inc.*, 2002 WL 31557665, *1 (Bankr. S.D.N.Y. October 15, 2002) mentions no specific facts in its determination not to grant reargument but only mentions that it is not appropriate to try to create a better record on reargument, which the Debtor did not try to do, since the record was entirely contained in his prior applications to Judge Peck, which were ignored. The website for the United States Bankruptcy Court for the Southern District of New York displays no case entitled "*In re Limmer*", and the only

afm/m p. 13 08-cv-4305

case so denominated available through internet research tools was decided in the Eastern District of Michigan. Therefore no comment is possible on this decision which is apparently incorrectly cited in the Neville Decl.

33. Both *Cartier v. Aaron Faber, Inc.*, 396 F.Supp.2d 356, 363 (S.D.N.Y. 2005) and *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) note that the material submitted on a motion for reconsideration should be of a nature sufficient to raise the possibility that the Court's prior determination would be changed. This does not present an insurmountable barrier, however, and the Court in *Shrader* did indeed change its decision based simply on a showing of additional decisions from different circuits and a more thorough presentation of the legislative history of the controlling statute, both of which apparently could have been presented on the earlier motion.

34. The perfunctory statement in *In re Spiegel, Inc.*, 2007 WL 1080190, *3 (Bankr. S.D.N.Y. April 4, 2007), incorrectly cited in the Neville Decl., that new facts or arguments not previously presented to the court should not be advanced is hardly essential to that decision, which found only that the prospective appellant did not file her notice of appeal within ten days of the entry of the judgment and presented no grounds for extending the time on the basis of excusable neglect. There is no hard and fast rule preventing the presentation of new arguments to a court on reargument, *see*, *Dawkins v. Healy*, 1996 U.S. Dist. LEXIS 7166 (S.D.N.Y. May 28, 1996) especially in the case at bar, where there was no opportunity to present additional evidence at a hearing in the first instance.

35. *In re WorldCom, Inc.*, 2007 WL 4179316, *1 (Bankr. S.D.N.Y. Nov. 27, 2007) does state that the burden is on the movant on any motion for reconsideration (or in that case, clarification). But a conclusory statement that the burden was not met is insufficient to negate the showing made on the Debtor's motion. The reference to violating the "law" in ¶ 11 of the Neville Decl. is misleading. The only violation was in meeting a deadline, but deadlines are of two types: jurisdictional and non-jurisdictional. The failure of the Debtor to <u>file</u> the designation of items to be included in the record in this appeal is not a jurisdictional statute of limitations. The seriousness

afm/m p. 14 08-cv-4305

of the delay must be measured against the justification for the neglect and any prejudice to be suffered by opposing parties. The Order of January 4, 2008 being appealed was not only subsumed in the order dismissing the Debtor's bankruptcy case but was the direct cause of it. Therefore, the timely appeal of the order dismissing the case eliminates the possibility of any prejudice to the Appellees and gave them adequate notice of all the issues that Appellant would raise on that appeal. Allowing the Debtor to perfect the appeal from the order denying reconsideration of the never-entered order denying any extension of time to file the required documents only allows the Debtor to present all the arguments affecting the dismissal of his case in one complete format. The Debtor does not pick and choose which time requirements to follow and which not to follow. That statute and the rules do it for him by specifying which are considered jurisdictional and which are merely procedural.

        36. The allegation of violating the "law" in allowing a delay in filing necessary papers contrasts with the violations of the law engaged in by Mr. Neville's client on a continuous basis. When 79 took title to the building, no notice was given to the tenants for about three weeks, a note being sent around the day after both tenants on the top floor were subjected to cascading water from roof leaks. When 79 finally decided something had to be done to prevent a recurrence, they sent unprofessional workers to resurface the roof on a Saturday without filing any application for a work permit with the Department of Buildings (both violations of the Building Code). Although notified in the first week in December, 2007, that the gas-fired heating unit in the rear of the Debtor's apartment had become inoperable, 79 has still not replaced it, and did not replace another such heating unit in another apartment until the heating season was over. That is a violation of law that is classified by the New York City Department of Housing Preservation and Development as being in Class "C"—immediately hazardous. It also waited an entire year before taking steps to remove accumulated lead paint from another apartment with three young children in occupancy. In view of the pious pronouncements of the Neville Decl. that he who seeks equity must do equity, the position of 79 with respect to violations of applicable substantive law defeat

afm/m p. 15 08-cv-4305

any rights it might have for equitable consideration.

37. The allegation in ¶ 13 that the Debtor is a "chronic" litigant in the Housing Court in New York City is patently false. Interestingly, the Neville Decl. admits in ¶ 13 that his client was aware of the summary proceeding brought by the prior owner against the Debtor but nevertheless took no action to intervene. The remainder of the cases concerned commercial leases wherein the landlords were providing the conditions that the Debtor had bargained for in those leases. The allegation of "default" in one case is absolutely false (amounting to a violation of Fed.R.Civ.P. 11), and it even resurrects the tail end of a 20-year battle the Debtor had with his first landlord in New York, who besides renting an illegal space with a straight face was also the most proficient prevaricator of any that the Debtor has encountered since in his practice or his personal experience—one who was sued by a group of his tenants for fraud in the offering plan of the cooperative conversion of the building formerly occupied by the Debtor.

38. The limited relief from the automatic stay obtained by 79 to allow the continuation of the trial in the summary proceeding pending by 79 against the Debtor was for the purpose of quantifying the amount of the claim by 79 and allowed entry of a judgment only to that extent. Issuance of a warrant was expressly denied over the objection of Mr. Neville at the hearing of December 13, 2007.

39. Contrary to the assertions in ¶ 14 of the Neville Decl., the Stipulation settled all issues only through January 8, 2008. The condition of the apartment was not resolved in the January 8 Stipulation, only the amount of rent remaining after the abatement to be awarded the tenant for present and past conditions therein. The reference to violating the "law" are just as pejorative here as they were earlier in the Neville Decl.

40. The allegation later in ¶ 14 of the Neville Decl. that the Debtor still owes $30,210.00 in rent is not merely preposterous, or a breach of Fed.R.Civ.P. 11, but can only be characterized as an outright lie. The fact is that the Debtor, upon filing his current Chapter 13 case, deposited with the Court one month's future rent notwithstanding his valid claims for a continuing

afm/m p. 16 08-cv-4305

abatement. Then, thirty days later, he hand-delivered to 79's office a bank check in the amount of the full $23,000.00 of the stipulated judgment. Eventually, both of these payments were returned, but there was no justification even for returning them, much less using that unilateral decision to make the absurd allegation that the payments were never made and the Debtor still owes over $30,000.00 in rent.

41. The claim that the Debtor has paid only 6 months' rent out of 31 months of occupancy is a distortion at several levels. First, it undercuts the determination of the Court in accepting the Stipulation of Settlement that the full amount of rent for those 31 months is not owed. Secondly, it ignores the fact that the Debtor paid three months' rent at the beginning of his tenure, as well as a two-month security deposit which has never been returned or credited. It also ignores the payment of post-petition rent in the Debtor's first Chapter 13 case and the payments of rent and the judgment required by § 362(l) of the Code, as well as another post-petition rent payment in the current Chapter 13 case. The Debtor had planned simply to keep the rent money on hand in view of the refusal of 79 to receive it, but since its attorney has used this unjustified rejection of these valid payments as a feeble excuse to accuse the Debtor of wholesale dereliction in making the necessary rent payments to the extent that they are not in dispute, the Debtor will be forced into making more payments which may become a needless expense when similar unjustifi-able rejections occur. In fact, rent was not paid only for February, March and April of 2008; and for all said months the Debtor asserts a significant claim for an abatement based on the almost total failure of the landlord to provide heat as required by the New York City Housing Maintenance Code.

42. Contrary to the allegations in ¶ 15 of the Neville Decl., the actions of the Debtor in defending his rights under the statutory warranty of habitability and the Rent Stabilization Law do not amount to "vexatious" litigation practices. Like many landlords' lawyers, Mr. Neville views any attempt by a tenant to defend his rights or view a lease as a contract imposing correlative obligations on both parties as interfering with the divine right of a landlord to hold its tenants in

afm/m p. 17 08-cv-4305

servitude that expired in the Middle Ages and has been officially interred by the New York Court of Appeals in *Park West Mgmt. Corp. v. Mitchell*, 47 N.Y.2d 316, 391 N.E.2d 1288, 418 N.Y.S.2d 310 (1979). The Debtor seeks no more delay than the Code provides, refuses to be accused of harassment when he has suffered so much harassment from the landlord, and naturally acts to remain in possession of his rent-stabilized apartment, in accordance with the provision in that statute that its benefits cannot be waived by the tenant under any circumstances.

43. Judge Peck properly observed that the <u>timing</u> of the Debtor's first Chapter 13 petition was for the purpose of avoiding the dire consequences of §362(b)(22) of the BAPCPA, but that observance was if anything complimentary as a recognition of the ancillary effects of the BAPCPA changes and did not imply any criticism of the practice any more than filing a voluntary bankruptcy petition on the eve of a home foreclosure is in and of itself a perversion of the bankruptcy process for enabling a debtor to achieve the proverbial "fresh start". The accumulated rent for the Debtor's apartment, however it would be quantified, was a debt that had to be treated under a plan, and the intent of the Debtor to file a 100% Plan shows that his Chapter 13 filing was indeed a good-faith effort to reorganize his finances in the face of the unjustified refusal of certain clients (one in particular) to pay or even to negotiate the bills that they had accumulated. Like most landlords' lawyers, Mr. Neville views any law that enables a tenant to remain in a rent-regulated apartment as a bad law and any attempt to take advantage of one's legal rights thereunder is a bad-faith effort to harass a poor landlord (including the present landlord whose net worth probably reaches into the billions).

44. Nor is it an indication of "bad faith" to point out the various factors beyond the Debtor's control that have contributed to his present financial situation. In all cases, the Debtor's motions for reconsideration were grounded in aspects of prior decisions (or lack of decision) that the Debtor believed and still believes are contrary to controlling principles of law or material facts that the lower Court has not fully appreciated.

45. The Neville Decl., in ¶ 16, attempts to place too much significance on the

afm/m p. 18 08-cv-4305

clerk's deficiency notice, which is a standard form sent to any filer who commences his case with a "skeleton" filing, leaving the work of completing the ten Schedules and the Statement of Financial Affairs to a later date if immediate relief is required. The Debtor did not ignore the notice, he filed what appeared to be the proper paper—his Order to Show Cause. That was followed by the proposed *ex parte* order granting the relief requested. At the time that request was made, it appeared that three weeks would be sufficient additional time. But when no decision was made on the Debtor's application, it was reasonably assumed that whenever the decision was made, some amount of time would be allowed. After all relief was orally denied on December 13, 2007, there was no longer any option of dropping all other activities to concentrate on the preparation of the Schedules.

46. What the Neville Decl. (and the lower Court) continually ignores is the degree of complexity involved in preparing the Schedules for a debtor who is "in business" under the Code. The Schedules become as complicated as those of a small corporation filing for protection under Chapter 11. In this Debtor's case, the were whole file cabinets full of documents that were needed to compile accurate statements of the amounts collectible from former clients as accounts receivable. It was not the Debtor's choice that his files were in disarray; it was the unavoidable consequence of having to move his office three times in a year (from a loft on Chrystie Street into basement storage into a loft in Long Island City). That sequence was made unavoidable by the fact that his plan to open an office in lower midtown Manhattan with another attorney was lost because of the protracted illness of that other attorney. In retrospect, it appears that the Debtor's first bankruptcy case could have been saved by simply making wild guesses for each of the 20-odd entries under paragraph 16 of his Schedule B and filing repeated amended schedules later in order to correct the deficiencies. If the Debtor had done so, however, Mr. Neville would no doubt have also assailed him by claiming bad faith in not inserting up-to-date figures in his original Schedules. One of the issues of law to be presented to this Court is whether honesty and accuracy in a debtor's Schedules are more important than the arbitrary filing schedules in the Code and the Bankruptcy

afm/m p. 19 08-cv-4305

Rules.

47. It is also appropriate for the Debtor to point out that there was obviously some irregularity in the transmission of the file to this Court with the recommendation that the appeal be dismissed. When the appeals clerk in the Bankruptcy Court was questioned, he asserted that he had left a telephone message for the Debtor, but no such message was received. Any filing in an active case in this Court or in the Bankruptcy Court, under the ECF system, should generate an e-mail notice to the parties that the filing has been made; no such e-mail was received by the Debtor when the recommendation to dismiss was transmitted to this Court. At a time when the Debtor was moving his office yet again, it should be considered excusable neglect that he was not able to check the Court's docket every day in a case where no activity was expected at the time.

48. The Neville Decl. further makes the false statement that the Bankruptcy Court granted the Trustee's motion in an order on January 24, 2008. Since this Order was not the Order that was submitted to the Court with the Trustee's motion to dismiss (it could not have been since the Debtor had in the meantime filed all his Schedules and Statement of Financial Affairs) another Order had to be submitted by the Trustee. The only plausible explanation for the January 24 date on the final order was that it was picked up by the computer when the proposed Order was amended to limit its scope to the absence of a filed Chapter 13 Plan. It is not physically possible that the revised proposed order could have been transmitted to the Judge after the hearing ended in the late after noon of January 24 (and the necessity for the Trustee's staff attorney to return to the Trustee's office in White Plains) and further that the Court would have had the opportunity to review the transcript (as the Order on reconsideration states it did) to confirm that the direction had been to submit an order and not settle one. The only plausible explanation for the fact that the Order was entered on February 1, 2008, is that it was signed on February 1 after the procedures described above. By that time, the Debtor had filed his Plan, and it was a valid ground for reconsideration that the Court did not consider all documents that had been filed before its Order was entered. The lower Court also did not consider that no payment could be made to the Trustee

afm/m p. 20 08-cv-4305

until a proposed Plan is filed so that the amount of the required payment could be quantified.

49. In ¶ 18 of the Neville Decl., he repeats two irrelevant or untrue allegations. The first is that the Debtor has no "equity" in the premises. This quotation from the Code (§ 363[d][2][A]) really has no applicability to a debtor who is a tenant, rather than an owner. But if it were to be liberally construed (a rent-regulated tenant does have a quasi property interest in his statutory entitlements, *see Gramercy Spires Tenants Ass'n v. Harris*, 446 F.Supp. 814, 826 [S.D.N.Y. 1977]), Appellant certainly does have "equity" in the apartment, since the capitalized value of his entitlement is approximately ten times the amount of the outstanding judgment against him which has already been paid. The second is that Appellant is denying to 79 the "use" of the premises. The facts contained in the history of the conduct of 79 since taking ownership of the subject building show that 79 is not interested in the "use" of the apartment at all. Its intent is gradually to vacate the entire building[3] as part of its speculative approach to development on the Upper East Side.

50. 79 is an affiliate of Extell Development Company, one of the larger developers of new, "luxury", high-rise apartment construction on the Upper East Side of Manhattan, where the Debtor's apartment is located. It is attempting to assemble a development plot along one of the last complete blockfronts on First Avenue that still contains all of the original buildings built in the 1880s. Thus far, it owns 3 of the 10 lots available for such a site assembly. It is proceeding to harass the rent-regulated tenants by denying essential services and repairs and putting pressure on them claiming such conditions as illegal sublets. The entire building contains only 6 apartments and one ground-floor store. The stores lease will expire in a year or two and 79 has stated its intention not to renew. Three of the six former rent-regulated tenants have left. Two of these apartments are being held vacant (and in an uninhabitable condition). The third is rented temporarily to an employee of an affiliate of 79. From this history it is evident that no one is depriving

---

[3] Other tenants have already received offers of a stipend for relocating voluntarily and leaving their apartments vacant.

afm/m p. 21 08-cv-4305

79 of the "use" of its premises. Its only loss is the speculative value of a vacant apartment, which would be held vacant contrary to the intent of the Bankruptcy Code (to prevent the receiving of a "windfall" to any party by such unexpected developments as a default in appearing or perfecting an appeal, *see, In re Lew Mark Cleaners Corp.*, 86 B.R. 331 (Bankr., E.D.N.Y. 1988), and in violation of the intent and spirit of the New York City Rent Stabilization Law as well. The entire contents of ¶ 19 of the Neville Decl. is no more than a repetition of the same smokescreen propounded in the earlier paragraphs.

51. The allegation in ¶ 18 of the Neville Decl. that the Debtor owes $30,210.00 in rent is just as false as it was earlier in the Declaration. All legal fees were included in the Stipulation of Settlement on January 8, 2008. 79 does not deserve legal fees for returning the Debtor's valid deposits and rent payments and then attempting to perpetrate a fraud upon the Court by claiming that the Debtor is in arrears on rent. This Debtor is entitled to use his knowledge of the court system to his own advantage the same as any debtor would be who is represented by able counsel. That 79 waived any claim it had that 362(l) of the Code did not apply by failing to raise it within the ten days allotted to it after the Debtor's initial deposit of one month's rent was made upon his bankruptcy filing is no ground for claiming that the Debtor is using the court system as a "sword" against the landlord.

52. Contrary to the allegations in ¶ 20 of the Neville Decl., the Debtor is not seeking to violate rules with impunity but rather seeking an equitable resolution of a problem that became crucial when the recommendation to dismiss the appeal was transmitted to this Court without the required notice being sent to the Debtor. It is interesting that the Neville Decl. cited <u>Richardson on Evidence</u> for the proposition that clerk's actions are presumed to be correct, since <u>Richardson</u> deals with the New York law of evidence exclusively and is not based on the Federal Rules of Evidence. In any event, something was not correct in the transmission of the recommendation, and in this case it was an omission rather than an act that was improper. Since its effect can be easily ameliorated by the granting of this motion, which would not prejudice the Appellees who must

afm/m p. 22 08-cv-4305

defend the appeal against the dismissal of the Debtor's case in any event, that relief should be granted.

53. Granting the motion to vacate the dismissal and consolidate the appeals does not implicate a showing of any controlling law that has been overlooked or material facts misapprehended. It is not necessary to show an overwhelming probability of success on an appeal to be allowed to prosecute it. Any bankruptcy litigant has the right to an appeal of a final determination. The ultimate final determination is inextricably linked with the appeal of the order refusing to allow any extension of time to file the required documents, including a proposed Chapter 13 Plan. Since all required documents were filed, and since the Bankruptcy Judge clearly acted erroneously in ignoring an application before him rather than denying it, the Debtor has a reasonable expectation of success on the within appeals.

54. As indicated above, the argument in the Neville Decl. based on "equity" is profoundly misplaced. It is 79 which has repeatedly violated the law, and the laws that it has violated are substantive, not procedural. The Neville Decl. nowhere explains how it is possible that an attorney doing his best to comply with an outstanding order of a higher court is somehow violating the law applicable to his bankruptcy case when it is precisely his obligations under that order of the higher court that have placed him in his predicament.

55. The Court should be informed that the last transcript needed to perfect the appeals has just been received today, with apologies from the transcriber who asserts he thought it had been sent before.

56. The statement in ¶ 22 of the Neville Decl. that "all" the Debtor had to do was file his schedules within the 15 days allotted by the Code. While maintaining an ongoing practice and trying desperately to search for new paying clients, the Debtor had spent well over an entire day just trying to estimate the value of one account receivable. There are 20 on his Schedule B. That is separate from the attempt to evaluate the various claims against him and the construction of a "budget" of monthly expenditures when one's income varies as much as 1000% from one

afm/m p. 23 08-cv-4305

month to the next. It may be that opposing declarant is insulated from the vagaries of non-paying clients by the fact that a landlord's attorney can always place a lien on the property that he is earning his fee defending. Not all attorneys have that luxury. Given the dispersed and disorganized state of the Debtor's files at the moment he was compelled to file his Chapter 13 case, it is not unexpected that the time needed to complete a respectable set of Schedules, to which he could honestly sign his name under Fed.R.Civ.P. 11, would take more than the 15 days allotted by the Code. It is precisely for situations such as this that the provisions in the Code allowing for extensions of time to be requested and granted are present in the Code. They are not there to be ignored, which Judge Peck admitted he had done. The allegation of lack of prejudice to the Debtor is disingenuous, since it would have been impossible to construct a realistic Chapter 13 Plan without knowledge of the data contained in an accurate set of Schedules, which was not available until January 21, 2008.

57. The attempt to engender sympathy for his client contained in ¶ 23 of the Neville Decl. is not convincing. 79 was "suffered" only because it has not supplied essential services and has engaged in dilatory tactics in the Housing Court, commencing with the fact that it did not intervene in the proceeding which was pending when it took title to the property and which was adjourned for several weeks with no action taken by 79. This creditor would not have to worry about lost money paid to lawyers if it would have accepted the payment of the judgment as the Code obligated it to do. Instead, it has shown its willingness to expend any amount of money on lawyers as long as there is a chance that it could obtain removal of the Debtor and get another apartment that it can warehouse in expectation of demolishing the building to put pressure on other owners on the block to sell their properties to Extell Development as well.

58. 79 is in no position to complain about justice delayed. If it wants "justice" from the judgment obtained in the Housing Court, it can accept that judgment, which has been paid. It deserves no "justice" on the basis of the lease since any lease for residential accommodations in the State of New York is deemed to include the warranty of habitability, which 79 has repeatedly

afm/m p. 24 08-cv-4305

and continually violated. This is a law much more serious than the procedural "law" that the Debtor is accused of violating. A warrant of eviction can always be vacated for good cause shown under New York law, and the Debtor has more than shown enough "good cause" to vacate that warrant and retain the valuable leasehold, the forfeiture of which is always sought to be avoided under equitable principles.

59. The allegations of lack of good faith and dilatory conduct in ¶ 24 of the Neville Decl. are the same conclusory allegations that are made throughout the Declaration. Any allegation that tends to injure the Debtor and uphold the landlord is alleged without any regard for the truth of the allegation or any support therefor. There is no interference with the concept of the finality of judgments here—the full amount of the judgment has been paid. What the landlord seeks is to escape what should be the clear intent of the Bankruptcy Code to relieve a Debtor of the threat of eviction from his residence, which is an essential element of his plan for reorganization under Chapter 13. *See, In re Butler*, 14 B.R. 532 (S.D.N.Y. 1981). The mere failure to file papers by a non-jurisdictional deadline should not be fatal to an appeal since it constitutes excusable neglect under Fed.R.Bankr.P. 9006(b). *Pioneer Investment Services, Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380 (1993).

60. The Neville Decl. in ¶ 25 continues to misdescribe the order dismissing the appeal in an effort to create the illusion that the within motion is untimely, which it is not. As shown above, the conduct of the landlord has been so inequitable, its violations of substantive law so severe, that the balancing of the equities, if that were to be the controlling factor, weighs heavily on the side of the Debtor. The landlord cannot claim any prejudice in vacating the dismissal and consolidating the appeals because it must defend the appeal of the dismissal of the Debtor's entire bankruptcy case in any event. The reference to "another stay" with respect to the Debtor's current bankruptcy case is to an entirely different stay, with drastically reduced scope and indeed some question whether it will ultimately be maintained as a stay at all. In no manner can the Debtor's current bankruptcy case be considered a satisfactory alternative for the earlier case, which was

afm/m p. 25 08-cv-4305

filed before the warrant of eviction was issued.

61. It is especially annoying to read the Debtor's legitimate and vigorous defense of his rights in the course of the summary proceeding that was allowed to proceed in the Housing Court even after the landlords' attorney defaulted on the initial appearance of the proceeding on that Court's calendar be characterized as not acting in good faith. The Neville Decl. offers no precedent for the concept that the vigorous defense of an action constitutes acting without good faith. It appears that he Declarant is simply upset that his case was not presented to that Court efficiently enough to have reached a determination favorable to his client's wildest dreams. Contrary to the other allegations in ¶ 26 of the Neville Decl., there were several unanticipated "human" events that contributed to the Debtor's problems, including, *inter alia*, the refusal of the Second Circuit to grant his motion to withdraw from the representation of a non-paying client and the failure of the clerk's electronic reporting system to send the required notice of the transmittal of the bankruptcy file to this Court.

62. Quite apart from the fact that the conclusory and unsupported allegation in ¶ 27 of the Neville Decl. that there is no evidence that would lead to success on the within appeal, its allegation that the Debtor's present bankruptcy case has created a "new stay" is diametrically opposed to the order of Judge Glenn provisionally "reinstating" that stay—an order that was entered in response to Mr. Neville's own Objection to the Debtor's certification under § 362(l)(2) of the Code. Apparently Mr. Neville has not heard of the principle of judicial estoppel whereby success on an issue in one court precludes arguing the opposite in another court.

63. The entire Neville Decl. should be rejected as an expression of any substantive objection to the Debtor's motion to vacate the dismissal of the appeal of the January 4, 2008 order and to consolidate that appeal with the appeal of the order of February 1, 2008. It should further be evaluated as indicative of a contempt for the standards of Fed.R.Civ.P. 11 and for the taking of appropriate action thereby.

WHEREFORE, the Debtor's motion for relief from the judgment dismissing the

appeal of the Order of January 4, 2008, or alternatively for modification of said order and

consolidation of that appeal with the appeal of the Order of February 1, 2008, should be granted

in all respects.

Dated: New York, New York
      July 21, 2008                         /s/ Mayne Miller
                                         MAYNE MILLER (MM-4106)
                                         85 Worth Street, 5th Floor
                                         Mail: P.O. Box 8050, G.P.O.
                                         New York, NY 10116
                                         (212) 966-1696
                                         Attorney for Appellant